1  **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9   Jenae Finton, et al.,                    No. CV-19-02319-PHX-MTL

10                 Plaintiffs,               **ORDER**

11   v.

12   Cleveland Indians Baseball Company LLC,
     et al.,

13

14                 Defendants.

15        The Court now addresses the parties' cross-motions for summary judgment (Docs.

16   56, 58). These motions are fully briefed and were discussed at oral argument. The Court

17   now resolves these motions as follows.

18   **I.    BACKGROUND**

19        Plaintiff Jenae Finton began working for Defendant Cleveland Indians Baseball Co.,

20   LLC (the "Club") as a part-time employee in November 2015. (Doc. 59, Plaintiffs'

21   Statement of Facts ("PSOF") ¶ 1.) Ms. Finton was an "Assistant, Arizona Operations" for

22   the Club's Arizona spring training facility, a nonexempt position under the Fair Labor

23   Standards Act ("FLSA"). (*Id.* ¶¶ 1–2.) In this position, Ms. Finton's wages were $14.00

24   per hour in 2017 and $16.00 per hour in 2018. (*Id.* ¶ 4.) Ms. Finton reported directly to

25   Defendant Ryan Lantz—the Director of Arizona Operations.[1] (*Id.* ¶ 2.) Mr. Lantz's

26   supervisor, Jerry Crabb, works in the Club's main office in Cleveland, Ohio. (*Id.* ¶ 3.)

27        The job duties that Mr. Lantz assigned to Ms. Finton included "participating on

28   ─────────────────────
     [1] Ms. Finton also filed this lawsuit against Mr. Lantz's wife, Mrs. Lisa Lantz. (Doc. 24
     ¶ 8.)

various non-profit boards, working with local charities to coordinate fund-raisers, arranging and staffing player events and outings, working with vendors and business contacts to ensure the Club facilities were maintained, ordering necessary supplies, and scheduling security staff and interns." (*Id.* ¶ 10.) Ms. Finton also, many times, had to "perform nightly walk-through's [sic] of the Club's facilities, which involved setting the alarm, walking the property, and making sure doors were closed and locked" when Mr. Lantz was unavailable. (*Id.* ¶¶ 17–19.) Mr. Lantz provided Mr. Crabb with a detailed "Year-Round Job Responsibilities" outline for Ms. Finton in May 2018, which outline these same job duties and several others. (Doc. 59-2 at 38–39.) Ms. Finton's participation in these activities and organizations was at Mr. Lantz's request and benefitted the Club. (PSOF ¶ 21.) Given the amount of job duties and activities Ms. Finton dealt with, she "normally did not take a lunch period and ate at her desk while working." (*Id.* ¶ 23.)

The Club used a computer-based system called "ABI" to record time or hours worked by Club employees throughout Ms. Finton's employment. (Doc. 57, Defendant's Statement of Facts ("DSOF") ¶ 7.)[2] The ABI system could record employees' hours in two ways: (1) by an employee physically scanning their badge at the Club's facility to clock in and clock out, and (2) by an employee remotely accessing the ABI system on a computer and reporting through ABI's "timekeeping or time-recording function." (*Id.* ¶¶ 8–14.) Ms. Finton used both ways to record her hours at times and was trained on the ABI timekeeping system, which was "very simple and easy to use." (*Id.* ¶¶ 15, 23.) When the Club temporarily relocated its staff to the Goodyear Ballpark while its facilities were being renovated in June 2017, the physical timeclock was not moved, and employees were told to use the online reporting method.[3] (PSOF ¶¶ 27–28.) Ms. Finton then struggled to log her hours online because of internet connection issues. (*Id.* ¶ 29.) Ms. Finton therefore began reporting her hours directly to Mr. Lantz, who then inputted her hours into ABI. (*Id.* ¶ 29.) Mr. Lantz and Ms. Finton had in-person meetings frequently to input, and have Mr. Lantz

---

[2] The Club also used a "computer-based system" called "UltiPro," which contained employees' payroll information, paystubs, and sick and paid time off data. (DSOF ¶¶ 47–48.) All Club employees could access and print this information. (*Id.* ¶ 49.)
[3] The Club's regular operations are also in Goodyear, Arizona. (Doc. 59-1 at 15.)

approve, her time into ABI. (*Id.* ¶ 30.)

Even when the Club finished its renovation and moved back to its facilities, Ms. Finton "continued her practice of providing hours to [Mr.] Lantz either orally or in writing." (*Id.* ¶ 31.) Although Ms. Finton used the in-person timeclock sporadically, she continued this practice because "she was frequently away from her desk" on Club business. (*Id.*) This practice of reporting her hours to Mr. Lantz was "either through email, a hand-written note, or orally" in their meetings. (*Id.* ¶ 33.) Mr. Lantz did not, nor did any other Club employee, "discipline[] or counsel[]" Ms. Finton for using this method to enter her time or for failing to use the ABI timeclock. (*Id.* ¶ 35.) Mr. Lantz had knowledge from emails and time-approval meetings that Ms. Finton was working overtime hours during several weeks. (*See, e.g.*, *id.* ¶¶ 49; Doc. 59-3 at 10–11, 36–42.) Mr. Lantz also knew that Ms. Finton used her personal phone off-premises for work matters on several occasions and thought it was "essential" for her to do so. (Doc. 59-3 at 2.) Even the Club's Human Resource Department acknowledged that there could be a potential "compliance issue" with Ms. Finton continuing to work on her personal phone off-premises because that time would be difficult to track and compensate. (*Id.*)

Ms. Finton took an unpaid vacation in July 2018 but worked several times during that trip. (*Id.* ¶¶ 73–75.) Ms. Finton emailed Mr. Lantz about player appearances that would occur during her vacation, Mr. Lantz emailed her requesting more information, to which she responded, and Mr. Lantz also called her three times to discuss work matters during that vacation. (*Id.* ¶¶ 73–78.) Ms. Finton was not paid for the two total hours she worked during that vacation. (*Id.* ¶ 79.)

In late December 2018, Ms. Finton emailed Mr. Lantz with the hours that she worked during part of December, which included several hours of overtime. (*Id.* ¶¶ 36–38.) Although Mr. Lantz acknowledged receipt of Ms. Finton's hours, Mr. Lantz was soon thereafter placed on administrative leave and did not input her time. (*Id.* ¶ 39.) This caused Ms. Finton's "next paycheck to be short." (*Id.*) Ms. Finton then contacted Mr. Crabb about her paycheck issue and Mr. Crabb "questioned her hours." (*Id.* ¶¶ 40–41.) Ms. Finton

explained her hours, asked to provide Mr. Crabb with more information to get paid for all her hours worked, and tried, unsuccessfully, to call Mr. Crabb twice to discuss the issue further. (*Id.* ¶¶ 41–42.) Mr. Crabb then emailed Ms. Finton stating that the hours she provided "would total more than 40 hours for a work week. As we try to sort through this, we are prepared to pay you for 8 hours for each day that you did not clock in and out properly in this and the prior pay periods." (*Id.* ¶ 43.) Ms. Finton did not receive overtime pay for her work in December and resigned her employment with the Club in January 2019. (*Id.* ¶¶ 44–46; Doc. 59-1 at 7.) Ms. Finton then discovered that Mr. Lantz "altered or failed to correctly record and pay time to" her on numerous occasions. (PSOF ¶ 49.) Mr. Lantz "never told" her that he "reduced her hours, disagreed with her reported time, or disciplined her for failing to use the timeclock." (*Id.* ¶ 50.)

A review of Ms. Finton's timeclock entries, emails to Mr. Lantz, personal recollection, and payroll records revealed that many more of her hours reported to Mr. Lantz or the Club were "altered" or recorded incorrectly. (*See id.* ¶¶ 49, 51–85.) In February 2018, for example, Ms. Finton helped the Club prepare and host a golf event. (*Id.* ¶ 51; *see also* Doc. 59-3 at 34.) Ms. Finton worked 9.5 hours on Monday, February 19, 2018, to prepare for the upcoming golf event. (Doc. 59-3 at 28.) The next day, she reported working for 11.5 hours, but Mr. Lantz manually entered only 9.5 hours into ABI. (PSOF ¶¶ 56-57.) On February 21, Ms. Finton "worked at the office for 6 hours and another 6 hours off-site," Mr. Lantz, however, did not input the 6 off-site hours and Ms. Finton was paid for 6 hours in total. (*Id.* ¶¶ 58–61.) Ms. Finton started her next day at 8:00 A.M. "running errands and taking care of items" for the golf event and ended this day with a 9:55 P.M. email to Mr. Lantz outlining outstanding items for the golf event. (*Id.* ¶¶ 62–65; *see also* Doc. 59-4 at 5.) Although Ms. Finton orally informed Mr. Lantz of these long hours the next day at a "payroll approval meeting," she was not paid for any of her time worked on February 22. (PSOF ¶¶ 64–65.) On Friday, February 23, Ms. Finton worked a "regular workday" followed by working 3 hours at the evening golf event. (*Id.* ¶¶ 66–67.) Ms. Finton was not paid for the additional 3 hours spent at the event. (*Id.* ¶ 68.) Ms. Finton

provides many other days in 2018 where Mr. Lantz unilaterally altered the time Ms. Finton reported or failed to enter Ms. Finton's time altogether. (*See, e.g.*, *id.* ¶ 49; Doc. 58 at 6–8.) If Mr. Lantz put in the hours that Ms. Finton provided him, there would be several weeks that surpassed the 40-hour threshold to be eligible for overtime pay.[4] (PSOF ¶ 49.) These events gave rise to this lawsuit.

Ms. Finton brought six causes of action: (1) FLSA Failure to Pay Overtime; (2) FLSA Failure to Pay Minimum Wage; (3) Arizona Minimum Wage Act ("AMWA"), A.R.S. § 23-362, *et seq.*, Failure to Pay Minimum Wage; (4) Arizona Wage Act ("AWA"), A.R.S. § 23-350, *et seq.*, Failure to Pay Wages; (5) Failure to Comply with Requirements of the Arizona Fair Wage and Healthy Families Act; and (6) Failure to Comply with Recordkeeping Requirements of the AWA. (Doc. 24 ¶¶ 83–134.) The first two causes of action under the FLSA are against both the Club and Mr. Lantz, while the last four are only against the Club. (*Id.*) The Club moved for summary judgment on all six causes of action. (Doc. 56.) Ms. Finton moved for summary judgment on five of the six causes of action, Counts I–V. (Doc. 58.) Both motions are fully briefed. (Docs. 62, 66, 68, 71, 72.)[5]

## II.   LEGAL STANDARD

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255

---

[4] The Court need not detail each instance that Mr. Lantz failed to record, or altered, Ms. Finton's reported time. There are several emails, time sheets, payroll records, depositions, and declarations supporting many weeks that surpass the 40-hour mark. (*See, e.g.*, Doc. 59-3 at 10–11, 36–42; Doc. 59-4 at 2.) Several of these weeks will be incorporated into this Court's analysis below.

[5] Mr. and Mrs. Lantz joined the Club's response to Ms. Finton's Motion for Summary Judgment but did not move for summary judgment on their own. (Doc. 64.)

(internal citations omitted*); see also Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994) (holding that the court determines whether there is a genuine issue for trial but does not weigh the evidence or determine the truth of matters asserted).

When, as is the case here, "parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council of Riverside Cnty. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations and internal quotations omitted). The summary judgment standard operates differently depending on whether the moving party has the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). As the party with the burden of proof, Ms. Finton "must establish beyond controversy every essential element" of their claims based on the undisputed material facts to be entitled to summary judgment. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003). The Club, by contrast, must merely establish that Ms. Finton cannot make out a prima facie case considering the undisputed material facts. *Celotex*, 447 U.S. at 322–23.

## III.  DISCUSSION

Ms. Finton argues that both the Club and Mr. Lantz violated the FLSA by failing to pay her overtime and minimum wage for all hours she worked. (Doc. 58 at 11–14.) Ms. Finton also contends that the Club violated several Arizona employment statutes. (*Id.* at 14–16.) Ms. Finton sued the Club on all six counts, but only sued Mr. Lantz on Counts I and II. (Doc. 24.) The Club argues that each of Ms. Finton's causes of action do not survive summary judgment. (Doc. 56.) The Court will address each argument in turn.

### A.  FLSA Claims

The FLSA, 29 U.S.C. § 201, *et seq.*, regulates the wage, hour, and working conditions of American employees. The FLSA also creates enforceable federal employment rights, such as rights to minimum wage and overtime compensation. *Id.* Certain employees are also exempt from the FLSA's regulations. *Id.* § 213. Ms. Finton, however, was a nonexempt employee at all relevant times. (PSOF ¶¶ 1–2.) Further, only an employer is bound by the FLSA's provisions.

1

### 1.    FLSA's Definition of "Employer"

2       The threshold inquiry on whether a party may be liable under the FLSA asks if that

3  party is an "employer." The FLSA defines an "employer" as "any person acting directly or

4  indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).

5  The statute defines "to employ" as "to suffer or permit to work." *Id.* § 203(g). Whether a

6  party is an "employer" under the FLSA is a question of law. *Torres-Lopez v. May*, 111

7  F.3d 633, 638 (9th Cir. 1997). "Courts have adopted an expansive interpretation of the

8  definitions of 'employer' and 'employee' under the FLSA, in order to effectuate the broad

9  remedial purposes of the Act." *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 754

10  (9th Cir. 1979). Under this expansive interpretation, "employees are those who as a matter

11  of economic reality are dependent upon the business to which they render service." *Id.*

12  (citing *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947)); *see also Goldberg v. Whitaker*

13  *House Coop.*, 366 U.S. 28, 33 (1961) (stating that "economic reality" is the test of

14  employment under the FLSA).

15       In analyzing "economic reality," courts must "consider the totality of the

16  circumstances of the relationship, including whether the alleged employer has the power

17  to hire and fire the employees, supervises and controls employee work schedules or

18  conditions of employment, determines the rate and method of payment, and maintains

19  employment records." *Hale v. State of Ariz.*, 993 F.2d 1387, 1394 (9th Cir. 1993) (citing

20  *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983)).

21  Although these factors "provide a useful framework" for analysis, "they are not etched in

22  stone and will not be blindly applied." *Id.* (citation omitted). Rather, the ultimate

23  determination must be based "upon the circumstances of the whole activity." *Rutherford*

24  *Food Corp. v. McComb*, 331 U.S. 722, 730 (1947). Two or more employers may be joint

25  employers of an employee, with each employer having individual liability for compliance

26  with the FLSA. *Bonnette*, 704 F.2d at 1469 (citations omitted).

27       The Club does not contest that it is an employer under the FLSA. (Doc. 56 at 3–7.)

28  Ms. Finton argues that Mr. Lantz is also an employer under the FLSA and can be held

individually liable for failure to pay overtime and minimum wage. (Doc. 58 at 10–11.) Ms. Finton contends the "economic reality" test tilts in her favor because Mr. Lantz had the ability to "recommend employees for hiring and firing," he "was the only on-site manager in Arizona and supervised and controlled" Ms. Finton's work schedule, he "controlled" Ms. Finton's conditions of employment and job duties, and Mr. Lantz "maintained Finton's employment records when he created her schedule, input [sic] her time, and approved her time entries." (*Id.*) Mr. Lantz responds by contending that he "did not have the unilateral power to hire and fire" Ms. Finton, the Club "ultimately controlled" Ms. Finton's work schedule and job duties, the Club "determined the rate and method of pay" for Ms. Finton, and the Club maintained the employment records for her. (Doc. 66 at 2–4.) Mr. Lantz therefore concludes that the economic reality test is not met, and he is not an employer within the FLSA's meaning. (*Id.* at 4.)

The Court agrees with Mr. Lantz. Mr. Lantz did not have the power to hire and fire the Club's employees, he only had the power to recommend these decisions which required further approval. Ms. Finton does not provide any evidence that Mr. Lantz hired or fired any other employee during her tenure with the Club. Mr. Lantz also did not, and could not, determine the rate and method of payment. The rate and method of payment was determined by the Club. (DSOF ¶ 1; Doc. 67 ¶ 4.) Besides helping Ms. Finton place her hours in the ABI system, the Club maintained her employment records, such as time records and payroll information. (*See, e.g.*, DSOF ¶¶ 14–16, 47–49; Doc. 67 ¶ 5.) Based on Ms. Finton's arguments and supporting documents, Mr. Lantz did supervise and control her work schedule and job duties to a considerable degree. (*See, e.g.*, PSOF ¶¶ 10, 17, 30, 82.) Even though Mr. Lantz supervised and controlled certain aspects of Ms. Finton's work, the other factors heavily outweigh that single consideration. Basing this determination on the "circumstances of the whole activity," Mr. Lantz is not an employer within the FLSA's meaning. The remaining analysis only pertains to the Club's liability.

## 2.      Overtime Claim (Count 1)

The FLSA requires that employers must pay employees overtime wages of one and

one-half times their regular rate of pay for each hour worked more than 40 hours during a week. 29 U.S.C. § 207(a)(1). To prevail on her FLSA claim, Ms. Finton bears the burden of proving that: (1) the Club was an employer under the FLSA; (2) Ms. Finton was an employee under the FLSA; (3) Ms. Finton worked overtime; and (4) she was not paid overtime for overtime hours worked. *Rogers v. Brauer Law Offices, PLC*, No. CV-10-1693-PHX-LOA, 2012 WL 426725, at *3 (D. Ariz. Feb. 10, 2012). An employee bringing an action for unpaid overtime compensation and liquidated damages has the burden of proving that she performed work for which she was not properly compensated. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946), *superseded by statute on other grounds*. If, however, the employer fails to keep adequate records of the employee's hours, the employee's burden is lightened. *Id.* at 687. Under *Mt. Clemens*'s burden-shifting framework that applies when there are inaccurate records, the employee "must only (1) prove that he has in fact performed work for which he is owed overtime, and (2) produce 'sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" *Ader v. SimonMed Imaging Inc.*, 465 F. Supp. 3d 953, 964 (D. Ariz. 2020) (quoting *Mt. Clemens*, 328 U.S. at 687).

Once an employee establishes the amount and extent of overtime worked as a matter of just and reasonable inference, the burden shifts to the employer to produce "evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Mt. Clemens*, 328 U.S. at 688. "An award of back wages will not be barred for imprecision where it arises from the employer's failure to keep records as required by the FLSA." *Brock v. Seto*, 790 F.2d 1446, 1448 (9th Cir. 1986).

Ms. Finton argues that the *Mt. Clemens* burden-shifting framework applies and that she has met her initial burden of proof. (Doc. 58 at 12.)  Ms. Finton points to her production of "emails" documenting her hours, "journal entries with hand-written notes of her hours," and other declarations and testimony identifying "several major events and functions that

she worked on . . . that required her to work long hours." (*Id.*) She also points to other records and testimony that show inaccurate timekeeping records and other occasions in which Ms. Finton worked overtime hours over several weeks for which she was not compensated. (*Id.* at 12–13.) The Club responds to Ms. Finton's arguments and moves for summary judgment on the FLSA overtime claim with the same two arguments: (1) Ms. Finton's failure to use the Club's reasonable timekeeping system precludes her claim, and (2) Ms. Finton has identified no overtime, over the course of a 40-hour workweek, for which she was not paid. (Doc. 56 at 3–7.)

The Court agrees with Ms. Finton that the *Mt. Clemens* burden-shifting framework applies. Ms. Finton has produced ample evidence to show that Mr. Lantz inaccurately recorded her work hours by unilaterally changing the hours Ms. Finton would provide him, filling in false hours, and failing to enter in the time altogether without adequate justification. (PSOF ¶ 49.) The Club's failure to maintain accurate records through Mr. Lantz's actions invokes *Mt. Clemens*'s lightened burden.[6] *See Sec'y of Labor, U.S. Dep't of Labor v. Valley Wide Plastering Constr. Inc.*, No. CV-18-04756-PHX-GMS, 2021 WL 410873, at *3 (D. Ariz. Feb. 5, 2021) (finding that the defendants "inaccurately recorded" the plaintiff's "work hours by filling in false hours or by manually altering the number of hours employees record without adequate justification").

Ms. Finton now has a lightened burden to show she has performed work for which she is owed overtime, and Ms. Finton must produce "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Mt. Clemens*, 328 U.S. at 687. Ms. Finton has provided more than enough evidence to meet this standard. Ms. Finton has produced emails, deposition transcripts, the Club's own time entry reports,

---

[6] The Court is aware that the Club notes that "the ABI time clock system accurately recorded" Ms. Finton's time and "on those few exceptions when the ABI time clock system did not accurately record her starting and stopping times she took steps to address the error." (Doc. 56 at 4.) The problem here, however, is not that the underlying ABI system was inaccurate on its own, but that Mr. Lantz's use of this system inaccurately recorded Ms. Finton's hours. Given that Mr. Lantz's inputting of Ms. Finton's time was one of the primary methods for recording her hours in the system, the inaccurate recording—through the altering and failure to enter certain hours—is what invokes the *Mt. Clemens* burden-shifting framework.

1    declarations, and even a spreadsheet listing the many instances in which Mr. Lantz failed

2    to input her time or altered her reported hours worked.[7] This evidence, when read together,

3    substantiates the estimates of overtime worked for several different weeks during Ms.

4    Finton's employment.

5        For example, Ms. Finton has produced evidence that during the week of February

6    19–23, 2018, she worked several hours—roughly 18 hours of unpaid overtime—preparing

7    for and attending a golf event for which she was not compensated for. (*See* PSOF ¶¶ 51,

8    56–68; Doc. 59-3 at 28, 34; Doc. 59-4 at 5.) Ms. Finton also provides emails that she sent

9    to Mr. Lantz, which if recorded as she stated, would have produced several weeks in which

10   she was owed overtime pay. (*See, e.g.*, Doc. 59-3 at 10–11, 36–42.) These weeks include:

11   7 hours of overtime for June 11–16, 2018; 4.5 hours of overtime for July 30–31, 2018 and

12   August 1–3, 2018; 6 hours of overtime for September 10–14, 2018; 5.5 hours of overtime

13   for September 17–21, 2018; 11 hours of overtime for September 23–28, 2018; 5 hours of

14   overtime for October 1–5, 2018; and 10 hours of overtime for November 12–16, 2018.[8]

15   (*See id.*) Ms. Finton also submitted evidence that she worked two weeks in December 2018

16   that well-eclipsed the 40-hour mark. (*Id.* at 10–11.) There is no evidence that Mr. Lantz

---

17   [7] The Club objects to the admissibility of Ms. Finton's spreadsheet, to the extent it is used
18   "to establish as a matter of 'undisputed fact' that she worked the hours listed, or that she is
     entitled to overtime compensation for those hours." (Doc. 62 at 5–7 (emphasis omitted).)
19   The spreadsheet simply lists each date in which Ms. Finton believes that Mr. Lantz altered
     or failed to record her time or where overtime was owed to her over a span of several
20   weeks. (*See* Doc. 59-4, Exh. 23, at 38–39.) "At the summary judgment stage, we do not
     focus on the admissibility of the evidence's form. We instead focus on the admissibility of
21   its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). Thus, "[a]n affidavit
     or declaration used to support or oppose a motion [for summary judgment] must be made
22   on personal knowledge, set out facts that would be admissible in evidence, and show that
     the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Ms. Finton
23   has listed the foundation for each entry listed in the spreadsheet. (*See* PSOF ¶ 49.) To lay
     the foundation for each entry, she cites several admissible sources, such as a sworn
24   declaration, emails, and other exhibits. Focusing on the contents of the spreadsheet, and
     not the admissibility of the evidence's form, Ms. Finton can rely on this evidence. *See*
25   *Davenport v. SP Jedi Inc.*, No. CV-18-02580-PHX-SMM, 2020 WL 1271380, at *5 (D.
     Ariz. Jan. 16, 2020) (evaluating the plaintiff's submission of "a spreadsheet of all incoming
26   deposits" she received from her employer as evidence to support the plaintiff's FLSA
     claim). If the Club argues the admissibility of certain deposition testimony, emails between
27   the Club and its employees, or the Club's business records (Exhibits 11 and 12), the Court
     agrees with Ms. Finton that these are all admissible for the Court's purpose of evaluating
28   the cross-motions for summary judgment. (*See* Doc. 72 at 8–10.)
     [8] These are weeks where the Club did not pay Ms. Finton all, or part of, the overtime hours
     she reported to Mr. Lantz. (*See* Doc. 59-3 at 19–32.)

objected to Ms. Finton working these hours. In fact, Mr. Lantz would just respond "Got it, thanks!" and go on to enter a lesser amount he thought that Ms. Finton had worked. (*Id.* at 10–11, 36–42; *see also* Doc. 59-2 at 26–27.) This is only a representative sample of weeks where Ms. Finton has produced enough evidence to prove she worked periods of time requiring overtime and the amount and extent of that work as a matter of just and reasonable inference. *Mt. Clemens*, 328 U.S. at 687.

Ms. Finton has not provided merely "conclusory allegations about her work schedule," which the Club argues. (Doc. 56 at 6.) Even if this were a closer call, "the Ninth Circuit . . . appear[s] to take a more relaxed approach to a plaintiff's initial burden in the *Mt. Clemens* framework." *Ader*, 465 F. Supp. 3d at 965–66. Courts have allowed much less evidence than Ms. Finton has provided here to prove a plaintiff's burden under *Mt. Clemens*. *See, e.g.*, *Manuel v. Quest Diagnostics, Inc.*, 341 F. App'x 348, 349 (9th Cir. 2009) (holding that the plaintiff's testimony that she worked overtime between 10 and 20 times during her 30-minute lunch break, and sometimes after work, was enough to send her claim to a jury); *Brock*, 490 F.2d at 1447 (finding that employees' testimony that they worked over 40 hours a week without overtime pay was neither "too unspecific" nor "too speculative"). The Club also points to areas in Ms. Finton's deposition where she could not recall the exact hours worked on certain weeks during her employment. (Doc. 56 at 5–6.) This, however, does not impact Ms. Finton's overtime claim given the amount of evidence she has produced in her favor. *See Ader*, 465 F. Supp. 3d at 966 ("[C]ase law in the Ninth Circuit does not indicate that, in the realm of *Mt. Clemens*, a plaintiff's failure to recall specific weeks for which he was not properly compensated dooms [her] overtime claim.") (citations omitted). The Club's counsel at oral argument proffered that Mr. Lantz could testify *why* he unilaterally altered Ms. Finton's time or declined to put her time into the ABI system in certain circumstances. The record, however, does not contain one instance where Mr. Lantz provides adequate justification as to *why* he was doing this with Ms. Finton's reported time. Without this evidence, there is no genuine issue of material fact.

The Court is also not persuaded by the Club's argument that "[w]hen the employer

utilizes a reasonable process of recording hours worked, an employee may not recover payment or hours that she claimed to have worked but that did not record using that process." (Doc. 56 at 3–5.) Ms. Finton argues that the method she used to submit time is immaterial. (Doc. 68 at 5–6.) The Court agrees with Ms. Finton. The Club has cited no binding authority that supports its argument. The only binding case that the Club cites for this proposition is *Forrester v. Roth's I. G. A. Foodliner, Inc.*, 646 F.2d 413 (9th Cir. 1981). *Forrester*, however, does not mention that principle and stands only for the rule that "where the acts of an employee prevent an employer from acquiring knowledge, . . . the employer cannot be said to have suffered or permitted the employee to work in violation" of the FLSA. *Id.* at 414–15. Ms. Finton's failure to use the ABI system for clocking in and out does not defeat her overtime claim, especially when she regularly met with her supervisor to input this time, the Manager of Payroll Accounting Services for the Club testified that a supervisor could allow an employee to submit time in this way, and where Mr. Lantz confirmed to Mr. Crabb that he did not require Ms. Finton to use the timekeeping system at times.[9] (*See* PSOF ¶¶ 8–9; Doc. 69 ¶¶ 90–91.)

The Court therefore finds that Ms. Finton has produced sufficient evidence to support her overtime claim and estimates such that a trier of fact could determine the amount and extent of hours worked as a matter of just and reasonable inference. The Club has not met its burden to produce "evidence of the precise amount of work performed" or "evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *See Mt. Clemens*, 328 U.S. at 688. Although the Club has failed to produce this evidence and the Court may award damages, *see id.*, Ms. Finton has not provided a sufficient estimate of her damages as it relates to overtime hours worked after specific 40-hour weeks to award damages at this time. The Court therefore grants Ms. Finton summary

---

[9] As mentioned above, the FLSA notes that the word "employ" includes to suffer or permit to work. *See* 29 U.S.C. § 203(g). "[T]he words 'suffer' and 'permit' as used in the statute mean 'with the knowledge of the employer.'" *Fox v. Summit King Mines*, 143 F.2d 926, 932 (9th Cir. 1944). Courts have therefore "interpreted the FLSA to require that employers have knowledge of unpaid overtime." *Rogers*, 2012 WL 426725, at *7 (citing *Forrester*, 646 F.2d at 414). If knowledge is required, that is met here. Mr. Lantz, and even the Club's Human Resource Department, had knowledge that Ms. Finton was working overtime hours on several occasions. (*See, e.g.*, PSOF ¶¶ 15–16, 49.)

judgment on Count I as to liability, with damages to be proven at trial.

### 3. FLSA Minimum Wage Claim (Count 2) and the AMWA Claim (Count 3)

The FLSA requires employers to pay covered employees a minimum hourly wage of $7.25. *See* 29 U.S.C. § 206(a)(1)(C). Under the AMWA, however, Arizona employers must pay employees a minimum wage of $10.50 per hour from January 1, 2018 to December 31, 2018.[10] *See* A.R.S. § 23-363(A)(2). The FLSA's "savings clause" provides that the FLSA's protections are the minimum and requires employers to adhere to their state's more protective wage and hour laws. 29 U.S.C. § 218(a). Each employer must pay their employees all wages due on each of their regular paydays. A.R.S § 23-351(c). An employer may satisfy this requirement by (1) personally delivering the wages to the employee no later than five business days after the most recent pay period ends; (2) depositing the wages in the United States mail no later than five business days after the end of the most recent pay period to an address specified by the employee; or (3) personally delivering the wages to the employee no later than ten days after the end of the most recent pay period for an employer whose payroll system is out of state. *Id.*

When an employer does not properly compensate an employee, a minimum wage violation depends on the total pay for the workweek divided by the total time worked in that workweek. *United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 490 (2d Cir. 1960) ("[I]f the total wage paid to each [employee] in this case during any given week is divided by the total time he worked that week, the resulting average hourly wage exceeds [the minimum wage required by the FLSA]. We believe this is all that is necessary to meet the requirements of 206(a)."). The Ninth Circuit has followed the "workweek" concept established in *Klinghoffer* for FLSA minimum wage violations. *See Adair v. City of Kirkland*, 185 F.3d 1055, 1063 (9th Cir. 1999) ("The district court properly rejected any minimum wage claim the officers might have brought by finding their salary, when averaged across their total time worked, still paid them above the minimum wage."). The

---

[10] This statutory minimum wage rate applies because Ms. Finton contends that the two hours of unpaid work occurred in July 2018. (Doc. 58 at 14.)

workweek, not each individual hour within the workweek, determines whether an employer has complied with the minimum wage statute. *See Dove v. Coupe*, 759 F.2d 167, 171 (D.C. Cir. 1985); *see also* 29 C.F.R. § 776.4(a). Thus, no minimum wage violation occurs so long as the employer's total wage paid to an employee in any given workweek divided by the total hours worked in the workweek equals or exceeds the minimum wage rate. *See Adair*, 185 F.3d at 1062 n.6.

When a minimum wage violation does occur, to establish minimum wage liability, a plaintiff must show that: (1) she was employed by the defendant during the relevant time; (2) the defendant is an enterprise subject to the FLSA; and (3) the defendant failed to pay the plaintiff minimum wage for all hours worked by plaintiff in one or more workweeks. 29 U.S.C. § 206(a). An employee has the burden of proving that she performed work for which she was not compensated. *See id.*

Ms. Finton contends that, during the week of July 15, 2018, she "spent at least two hours of time handling Club business" while she was on vacation. (Doc. 58 at 14.) Ms. Finton contends she "was not paid anything" for that time. (*Id.*) To support her claim, Ms. Finton provides an email she drafted detailing player appearances that would occur during her vacation, Mr. Lantz's email requesting additional information, to which she responded, and a declaration stating that Mr. Lantz called her three times to discuss work matters. (PSOF ¶¶ 73–79.) The Club contends that it is entitled to summary judgment because Ms. Finton "has not disclosed any evidence that her average hourly rate in any work week equated to less than the applicable minimum wage for the week" and the *de minimis* doctrine precludes recovery. (Doc. 56 at 7–8; Doc. 62 at 7–8.)

Given that a minimum wage violation depends on the total pay for the workweek divided by the total time worked in that workweek, zero dollars paid for the workweek that Ms. Finton was on vacation divided by at least two hours worked in that workweek is zero. That figure is less than federal or state minimum wage. Ms. Finton was employed by the Club during this time, the Club is an enterprise subject to the FLSA, and the Club failed to pay Ms. Finton for these roughly two hours worked. *See* 29 U.S.C. § 206(a). Ms. Finton

1   has also provided emails substantiating her claim that she worked during the week she was

2   on vacation. (*See, e.g.*, Doc. 59-4 at 7, 9, 11–12.)

3       The *de minimis* doctrine precludes recovery of otherwise compensable activities if

4   the time spent performing those activities are small, irregular, or administratively difficult

5   to record. *Mt. Clemens*, 328 U.S. at 692. The court in *Lindow v. United States*, 738 F.2d

6   1057 (9th Cir. 1984), sets forth the factors that courts consider when evaluating whether

7   amounts of time are *de minimis*: "(1) the practical administrative difficulty of recording the

8   additional time; (2) the aggregate amount of compensable time; and (3) the regularity of

9   the additional work." *Id.* at 1063. "There is no precise amount of time that may be denied

10  compensation as *de minimis*. No rigid rule can be applied with mathematical certainty." *Id.*

11  "Rather, common sense must be applied to the facts of each case." *Id.*

12      As to the first factor, it does not seem administratively difficult to record the two

13  hours that Ms. Finton worked on vacation. Ms. Finton had access to the online timekeeping

14  system or could have emailed Mr. Lantz to input that time for her. This factor favors Ms.

15  Finton. The second factor looks to the aggregate amount of compensable time because

16  courts generally apply this *de minimis* test to small periods of time that occur daily or

17  weekly, which can be substantial over time when aggregated. *See Yates v. Health Servs.*

18  *Advisory Grp., Inc.*, No. 2:16-cv-04032-CAS(PLAx), 2017 WL 3197228, at *12 (C.D. Cal.

19  July 24, 2017) (collecting cases and noting that courts generally rule that "ten minutes per

20  day" or "approximately 200 minutes per month" is *de minimis*); *see also Lindow*, 738 F.2d

21  at 1062. Here, Ms. Finton's total time worked over vacation is two hours, which happened

22  in a single week as opposed to occurring sporadically over an extended period. Two hours

23  is a relatively significant amount of time, especially given a 40-hour workweek. The second

24  factor favors Ms. Finton. The third factor, the regularity of the additional work, weighs in

25  the Club's favor. Working for two hours on a vacation occurred only once during Ms.

26  Finton's employment and was an isolated event.

27      The Ninth Circuit has cautioned granting summary judgment in these situations

28  unless there was activity that "was clearly *de minimis*" or the amount of time approaches

"split-second absurdities." *See Rutti v. Lojack Corp., Inc.*, 596 F.3d 1046, 1058–61 (9th Cir. 2010) (reversing a district court's grant of summary judgment on its *de minimis* conclusion because "the record d[id] not compel a determination that the time consumed by [the activity] is *de minimis*"). The Court is mindful that "courts in other contexts have applied the *de minimis* rule in relation to the total sum or claim involved in the litigation. *Lindow*, 738 F.2d at 1063. Ms. Finton contends that she should be awarded "$14.50, doubled" and "$21.00, trebled" for her two uncompensated hours. (Doc. 58 at 14.) Looking to these totals in relation to the total sum that Ms. Finton contends is at stake in this lawsuit, these two hours are not necessarily *de minimis*. *See Alvarez v. Hyatt Regency Long Beach*, No. CV 09-04791 GAF (VBKx), 2010 WL 11515194, at *4 (C.D. Cal. Mar. 2, 2010) (finding "$102.53 for one week of unpaid compensation" not insubstantial for *de minimis* purposes). Evaluating the *Lindow* factors, the facts of this case, and using "common sense," a triable issue of material fact exists concerning whether the two hours were *de minimis*. *See Pelz v. Abercrombie & Fitch Stores, Inc.*, No. CV 14-6327 DSF (JPRx), 2015 WL 12712298, at *3 (C.D. Cal. June 4, 2015) (finding "a triable issue of fact" where the plaintiffs claimed they "had to wait for at least thirty minutes on certain occasions" for bag checks). The Court therefore denies the Club and Ms. Finton summary judgment on Counts II and III.

### B.    Arizona Employment Statutes

As mentioned above, Ms. Finton only asserts these Arizona statutory violations against the Club.

### 1.    AWA Overtime Claim (Count 4)

The AWA provides that "[e]ach employer in [Arizona] shall designate two or more days in each month, not more than sixteen days apart, as fixed paydays for payment of wages to his employees" and that "[e]ach employer shall, on each of the regular paydays, pay to the employees . . . all wages due the employees up to such date." Ariz. Rev. Stat. §§ 23-351(A), 23-351(C). The "[o]vertime or exception pay shall be paid no later than sixteen days after the end of the most recent pay period." Ariz. Rev. Stat. § 23-351(C)(3).

1   The AWA provides that a Plaintiff may recover in a civil action damages treble to the

2   amount of unpaid wages. Ariz. Rev. Stat. § 23-355(A). The Club contends the FLSA

3   preempts the AWA overtime claim. (Doc. 56 at 8.) Ms. Finton agrees "that the FLSA's

4   liquidated damages provision precludes recovery of treble damages," but she does not

5   agree that her AWA overtime claim is preempted if Ms. Finton's "unpaid wages fall outside

6   the overtime and minimum wage provisions of the FLSA." (Doc. 68 at 13–14.)

7   　　　The Court finds the Club's argument persuasive. A state law may be preempted by

8   a federal law if it falls into one of these categories: (1) express preemption, (2) field

9   preemption, or (3) conflict preemption. *Williamson v. Gen. Dynamics Corp.*, 208 F.3d

10   1144, 1149 (9th Cir. 2000). Conflict preemption applies here. Conflict preemption occurs

11   when it is impossible to comply with both federal and state law or when state law stands

12   as an obstacle to the accomplishment and execution Congress's purposes and objectives.

13   *Id.* In *Williamson*, the court ruled that a fraud claim did not conflict with the FLSA. *Id.* at

14   1155. The Court also stated that "[c]laims that are directly covered by the FLSA (such as

15   overtime and retaliation disputes) must be brought under the FLSA." *Id.* at 1154. District

16   judges in this District have held that the FLSA preempts a plaintiff's AWA overtime claim.

17   *See, e.g.*, *Nelson v. Network Infrastructure Corp.*, No. CIV 09-1172-PHX-DKD, 2010 WL

18   11515662, at *2 (D. Ariz. Mar. 30, 2010) (holding that a plaintiff's "use of the AWA to

19   recover damages from a violation of the FLSA would stand as an obstacle to the

20   accomplishment and execution of the full purposes and objectives of Congress in enacting

21   the FLSA"); *Wood v. TriVita, Inc.*, No. CV-08-0765-PHX-SRB, 2008 WL 6566637, at *5

22   (D. Ariz. Sept. 18, 2008) ("To allow Plaintiff to bring suit for a violation of the FLSA and

23   seek a remedy other than that provided by the FLSA would stand as an obstacle to the

24   accomplishment and execution of the full purposes and objectives of Congress in enacting

25   the FLSA."). The Court agrees that the FLSA preempts Ms. Finton's AWA overtime claim.

26   　　　The Court is not persuaded by Ms. Finton's argument that she is still "entitled to

27   recover her unpaid wages under Arizona's wage laws, plus treble damages," if these

28   "unpaid wages fall outside" the FLSA. (Doc. 68 at 13–14.) Courts have rejected this

argument to recover these wages, plus treble damages, in cases involving the same statutes Ms. Finton seeks to recover from. *See, e.g.*, *Wood*, 2008 WL 6566637, at * 3–6 (rejecting a plaintiff's attempt to recover unpaid wages, plus treble damages, under A.R.S. § 23-355 because of preemption); *see also Nelson*, 2010 WL 11515662, at *3 ("Plaintiff's AWA claims are an attempt to recover twice for the same FLSA violation. The FLSA remedy provisions are the exclusive vehicle of recovery under the FLSA."). Allowing Ms. Finton to proceed with her AWA overtime claim would conflict directly with Congress's enactment of the FLSA's remedy for employer's overtime violations. The Court therefore finds that the Club is entitled to summary judgment on Count IV.

### 2. Arizona Fair Wages and Healthy Families Act Claim (Count 5)

Arizona's Fair Wages and Healthy Families Act provides in pertinent part that:

> The amount of earned paid sick time available to the employee, the amount of earned paid sick time taken by the employee to date in the year and the amount of pay the employee has received as earned paid sick time shall be recorded in, or on an attachment to, the employee's regular paycheck.

A.R.S. § 23-375(C). "'Employee's regular paycheck' means a regular payroll record that is readily available to employees and contains the information required by A.R.S. § 23-375(C), including physical or electronic paychecks or paystubs." A.A.C. § R20-5-1202(13).

Ms. Finton argues that "employee paychecks and paystubs did not contain a record of employees' available, used, and paid sick time and that that [sic] this information was not available to employees through UltiPro, its payroll system." (Doc. 58 at 15.) Ms. Finton contends that even if this information were available on the Club's other online system, ABI, employee paystubs were not available there. (*Id.* at 16.) The Club, however, does not seem to argue that this sick time data was on Ms. Finton's actual paycheck or paystub, whether that was electronic or physical. The Club argues that it "maintained just such electronic records of its payroll data, including data on employees' accrual and use of paid sick leave under the Club's Arizona Sick Leave policy; that data is available in the Club's

1   ABI system." (Doc. 62 at 10; DSOF ¶¶ 57–59.) This sick leave data was also provided

2   through the Club's online payroll system, UltiPro. (DSOF ¶ 61.)

3           The only way the Club's argument prevails is if that sick time data being available

4   on the ABI and UltiPro systems is the equivalent to a "regular payroll record" and contains

5   the information required by A.R.S. § 23-375(C). *See* A.A.C. § R20-5-1202(13). The

6   applicable statute here does not limit a "regular payroll record" to paychecks or paystubs,

7   which is what Ms. Finton contends is fatal to the Club's argument. The statute provides a

8   non-exhaustive list of what would satisfy the employer's obligation to supply a satisfactory

9   payroll record. The Club's use of its online systems to post this sick time data to employees

10  was a regular payroll record because Club employees, including Ms. Finton, had constant

11  access to these online systems. Even Ms. Finton agreed that the ABI system was "very

12  simple and easy to use." (DSOF ¶ 23; Doc. 57-1 at 20.) The Club, however, has not

13  provided any undisputed evidence that these online systems contain the information

14  required by A.R.S. § 23-375(C). The Club only provides deposition testimony that the

15  Club's online systems contained the sick time data provided for in the Club's Arizona Sick

16  Leave Policy. (*See* DSOF ¶¶ 57–63; Doc. 57-1 at 103–04, 126–30.) This testimony does

17  not provide undisputed evidence that the ABI or UltiPro system contained the available,

18  earned, and paid sick time data required by Arizona law. Ms. Finton disputes that ABI or

19  UltiPro had information on the required sick time data and notes that the Club has failed to

20  produce records the Club maintains it provided employees. (Doc. 58 at 15–16; Doc. 68 at

21  15–16.)

22          Although the Club presumably has access to this sick time data, it has failed to

23  produce that. Because the Club and Ms. Finton both dispute whether the ABI or UltiPro

24  online systems displayed the information required by A.R.S. § 23-375(C), there is a

25  genuine issue of material fact as to whether the Club provided the available, earned, and

26  paid sick time data as required by Arizona statute. Summary judgment on Count V is denied

27  as to both parties.

28

1

### 3.     AWA Recordkeeping Claim (Count 6)

Ms. Finton argues that she was "frequently unable to log in to UltiPro" and "could not obtain access" to that system to view her paystub's earnings and withholding as required by Arizona law. (Doc. 68 at 14–15; Doc. 24 ¶¶ 127–34.) Arizona's wage statute requires that "[w]hen an employee's wages are paid by deposit in a financial institution the employee shall be furnished with a written or electronic statement of the employee's earnings and withholdings." A.R.S. § 23-351(E). The Club argues that Ms. Finton knew that she "could access [her] pay stubs by logging into the Club's 'UltiPro' payroll system." (Doc. 56 at 8.) The Club also points to the "representative samples of her pay stubs" in the record, which include "statements of her 'earnings' and 'deductions.'" (*Id.* at 9 (citing DSOF ¶ 50; Doc. 57-1 at 110–12).) Ms. Finton "agrees that she had an UltiPro account, but disputes that she was able to log in and review her payroll records on a regular basis." (Doc. 68 at 14.) Ms. Finton also recounts several times where she could not obtain access to UltiPro because of login errors. (*Id.* at 14–15.)

The Club provides examples of its electronic "pay stubs," which contain a statement of the employee's earnings and withholdings. (Doc. 57-1 at 110–12.) That is all the statute requires. *See* A.R.S. § 23-351(E). Ms. Finton's argument is unpersuasive. That she had trouble logging into the UltiPro payroll system at times to view this data does not change this analysis. When Ms. Finton made the Club aware of other instances in which she was unable to login to the Club's online systems, the Club would provide her with information or access to remedy the problem. (*See, e.g.*, DSOF ¶¶ 16, 18; Doc. 69-14 at 9; Doc. 57-1 at 117–18.) Ms. Finton has not shown a genuine issue of material fact. The Club is therefore entitled to summary judgment on Count VI.

## IV.     CONCLUSION

Accordingly,

**IT IS ORDERD granting in part and denying in part** the Club's Motion for Summary Judgment (Doc. 56). The Court grants summary judgment in the Club's favor on Counts IV and VI. The Court denies summary judgment for the Club as to Counts II, III,

and V, which will all proceed to trial.

**IT IS FURTHER ORDERED granting in part and denying in part** Ms. Finton's Motion for Summary Judgment (Doc. 58). The Court grants summary judgment in Ms. Finton's favor on Count I, with damages in an amount to be proven at trial. The Court denies summary judgment for Ms. Finton as to Counts II through V.

**IT IS FURTHER ORDERED** setting a trial-setting conference for **Thursday, April 1, 2021, at 10:00 A.M.,** in Courtroom 503, Sandra Day O'Connor U.S. Federal Courthouse, 401 W. Washington St., Phoenix, Arizona 85003-2151. Participants shall have their calendars available and be prepared to schedule dates for a Final Pretrial Conference and for trial. In-person attendance is preferred; however, the Court will permit telephonic appearance upon request.

**IT IS FINALLY ORDERED** referring this matter to United States Magistrate Judge Deborah M. Fine (selected by random draw) for a Settlement Conference. Counsel are directed to jointly contact the chambers of Judge Fine by emailing fine_chambers@azd.uscourts.gov or calling (602) 322-7630 no later than ten (10) days from the date of this order to schedule a Settlement Conference and for instructions regarding preparation for the conference. The parties shall promptly notify the Court at any time a settlement is reached during this litigation.

Dated this 19th day of February, 2021.

Michael T. Liburdi
United States District Judge